**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| IPF/ULTRA LIMITED PARTNERSHIP, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | NO. 2:08-CV-21 |
| UP IMPROVEMENTS, LLC, and ROYAL ABSTRACT OF NEW YORK, LLC, | ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on: (1) Plaintiff's Motion for Partial Summary Judgment, filed by Plaintiff, IPF/Ultra Limited Partnership, on April 25, 2008 [DE #16]; and (2) Motion of Defendant, UP Improvements, LLC, to Release Roof Escrow Funds Presently Being Held by the Clerk of this Court, filed by Defendant, UP Improvements, LLC, on July 3, 2008 [DE #22]. For the reasons set forth below, the motion for partial summary judgment is **DENIED**. The motion to release roof escrow funds is **GRANTED** and the Clerk of Court is **DIRECTED** to release the disputed Roof Escrow Funds in the amount of $208,179.00, along with all interest accrued thereon, to Plaintiff, IPF/Ultra Limited Partnership.

BACKGROUND

On January 18, 2008, Plaintiff IPF/Ultra Limited Partnership ("Ultra"), filed a two count complaint against Defendants, UP Improvements, LLC ("UP") and Royal Abstract of New York, LLC ("Royal"). In Count One, the subject of this motion for partial summary judgment, Ultra alleges that UP breached a May 23, 2007 Purchase and Sale Agreement (the "Agreement") by continuing to object to the release of certain escrow funds held by Royal, to which Ultra alleges it was entitled under the Agreement. On April 23, 2008, UP filed an answer denying that Ultra is entitled to the escrow funds or that it breached the Agreement.

Ultra filed the instant motion for partial summary judgment on April 25, 2008, arguing that there is no dispute of material fact regarding UP's interference with the release of the escrow funds, and because the terms of the Agreement dictate the release of the funds, summary judgment is appropriate on Count One. Ultra also seeks costs and attorney fees under the terms of the Agreement. In response, Defendant UP argues that summary judgment is inappropriate because there is a genuine issue of material fact. Specifically, UP contends that whether UP's performance of roof repairs as required by the Agreement was justifiably delayed or excused due to the force majeure clause in the Agreement is a question for the fact finder.

Aside from the partial summary judgment motion before the Court, UP has requested an order releasing the disputed roof escrow

funds ($208,179.00) that were deposited by Royal with the Clerk of Court in accordance with the Court's Order of May 6, 2008. The roof is now complete; therefore, UP believes it is appropriate for the roof escrow funds, including interest, to be released to Ultra. Ultra does not object to the release of the funds currently being held by the Clerk of Court. However, Ultra does not believe that this action alone satisfies UP's obligation to Ultra (as spelled out in the pending motion for summary judgment). Having been fully briefed, both motions are now ripe for adjudication.

Facts

On May 23, 2007, Ultra and UP entered into a Purchase and Sale Agreement whereby Ultra agreed to sell to UP real estate in Highland, Lake County, Indiana, known as the Ultra Plaza Shopping Center. When the parties entered into the Agreement, Ultra had an existing lease agreement with SVT, LLC (the Strack and Van Til grocery store, "SVT"), which was the primary tenant located in the shopping center. The existing lease agreement required SVT to reimburse Ultra for one-half the costs of replacing the roof at the shopping center.

Section 14.1 of the Purchase Agreement states, in pertinent part, as follows:

> The parties hereto acknowledge that the roof at the Shopping Center requires replacement. The lease between Seller and SVT provides, among other matters, that SVT will reimburse the Landlord for

3

one-half of the cost of the roof replacement for the premises occupied by SVT. At Closing, Seller shall deposit with the Escrow Agent, in an interest-bearing account, the sum of $208,179 (together with all interest accruing thereon, the "Roof Escrow"), which sum is equal to one-half of the cost of the roof replacement for the premises occupied by SVT. After replacement of the roof at the Shopping Center, Purchaser shall promptly bill SVT for SVT's share of the cost of the roof replacement and within two (2) business days of Purchaser's receipt of such funds from SVT, Purchaser shall authorize the Escrow Agent to disburse the Roof Escrow, plus all interest accrued thereon, to Seller. **If Purchaser fails to replace the roof at the Shopping Center and invoice SVT for SVT's share of such roof replacement by December 31, 2007 (subject to extensions for force majeure or other events, matters or delays beyond the reasonable control of Purchaser), Seller may deliver a written notice to Escrow Agent (with a contemporaneous copy of such notice to Purchaser) requesting a release of the Roof Escrow, including all interest thereon.** If [sic.] Escrow Agent shall promptly forward such notice to Purchaser upon receipt. If Purchaser does not object to such release within five (5) business days after receipt of such notice from Escrow Agent, then the Roof Escrow shall be disbursed by the Escrow Agent to Seller, and Seller shall have no further obligation to reimburse Purchaser for the roof replacement or any portion thereof.

(Compl. Ex. A, Section 14.1 (emphasis added).)

Then, in a nutshell, UP did not complete the roof replacement project by December 31, 2007. The more detailed version is as follows. DLC Management Corp. ("DLC"), the leasing and managing agent for UP, initiated the process of obtaining quotes from contractors for the roof replacement soon after the sale closed. DLC received two quotes, including one supplied by Centimark

4

Corporation. The Centimark quote was the preferred quote because it provided a "TPO layover" roof, which DLC believed to be a better quality product than the rubber roof offered by the other bidder. DLC entered into a contract with Centimark dated September 19, 2007, with a start date of October 15, 2007, and anticipated completion date of November 30, 2007 (in advance of the December 31, 2007 completion deadline).

On October 9, 2007, John Ritchie, Director of Facilities for SVT, sent an email to Leonard Soboleski, Midwest Regional Property Manager of DLC, objecting to the Centimark bid proposal, stating:

> Leonard, Centimark is a non union contractor and there is potential for picket of the shopping center if you contract with them. Our customer base has a high percentage of union workers and a picket will be bad for business. Please contact me so we can discuss further.

(Soboleski Aff. ¶ 10.) The Purchase Agreement does not contain a stipulation or requirement for the use of union contractors, and union labor was not discussed among the parties prior or during UP's receipt of bids. (*Id.* ¶ 7.) On October 11, 2007, Ritchie sent another email to Soboleski:

> Leonard, I have reviewed the situation with the president and we can not risk a picket. Strack and Van Til was recently recognized by the North West Indiana Federation of Labor as retail employer of the year so we cannot afford any non union bad press. Did you solicit any local roofing bids if so what was the cost difference?

(*Id.* ¶ 11.) A third e-mail was sent from Ritchie to Soboleski on October 18, 2008:

5

> Leonard, A non union bid is not a viable option for this project only union bids should be considered. A 25% increase warrants additional bids from local union contractors. We cannot agree to make up the difference for the entire project and issue a check for $110,776.00 we are willing to pay our share per the lease.

(*Id.* ¶ 12.)

Section 1.07 of the SVT lease, assumed by UP as part of the Purchase Agreement, provides in pertinent part as follows:

> Landlord covenants and agrees with Tenant that upon Tenant paying the rent and observing and performing all the terms, and conditions, on Tenant's part to be observed and performed, Tenant may peaceably and quietly have, hold, occupy and enjoy the Premises and Common Areas without hindrance or molestation . . . .

(Taub Aff. Ex. A, ¶ 1.07.) DLC obtained alternate quotes utilizing union labor because it was concerned that picketing of the shopping center would risk violating the covenant of quiet enjoyment for SVT. (Soboleski Aff. ¶ 14.)

Centimark provided DLC with an alternate bid utilizing union labor in the form of a change order. On November 19, 2007, David Wilkinson, President of SVT, agreed to the engagement of Centimark, pursuant to the change order, utilizing union labor. (Soboleski Aff. ¶ 15.) Centimark proposed placing the TPO layover over the existing roof of the shopping center, which required the existing roof to be free of moisture or freeze. (Turnell Aff. ¶ 5.) UP claims that although Centimark began the project after the November 21, 2007 change order was signed, it could not complete the project

due to unusually harsh weather conditions in Northwest Indiana during November and December, 2007, which included moisture and freeze. (Turnell Aff. ¶¶ 6-7; Soboleski Aff. ¶¶ 16-17.) Centimark cites adverse weather as the reason the project could not be completed prior to December 31, 2007. (*Id.*)

Meanwhile, on January 2, 2008, Ultra provided written notice to both Royal and UP of UP's failure to replace the roof and invoice SVT by December 31, 2007. The written notice demanded that Royal disburse the roof escrow to Ultra, including all interest. (Rosen Aff. ¶ 11.) On January 9, 2008, UP sent a letter to Royal, with copies to Ultra and Ultra's counsel, indicating it objected to Ultra's demand because UP "does not believe that the Agreement requires or even permits a disbursement of the Roof Escrow at this time." (Rosen Aff. ¶ 12; Rosen Aff. Ex. C.) UP's letter instructed Royal to "continue to hold the Roof Escrow pursuant to the terms of the Agreement." (*Id.*) Royal retained the roof escrow.

The roof replacement was substantially completed as of May 20, 2008. (Turnell Aff. ¶ 8.) Royal held the roof escrow, despite Ultra's January 2, 2008 notice and demand letter, until this Court ordered Royal to deposit the disputed roof escrow funds with the Clerk of the Court on or before May 18, 2008. The funds currently remain with the Clerk of Court.

7

DISCUSSION

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *NUCOR Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes "demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v.*

8

*Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (emphasis in original) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be "'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

> Whether UP's Delayed Performance In Replacing The Roof Is Excused Pursuant to the Force Majeure Clause in the Purchase <u>Agreement is a Question of Fact</u>

As set forth above, it is undisputed that UP was contractually

9

obligated to replace the shopping center roof by December 31, 2007, and that UP failed to meet that deadline. It is also undisputed that Ultra provided timely notice to all parties on January 2, 2008, demanding that the roof escrow funds held by Royal be released because of UP's failure to meet the deadline. In turn, UP timely filed its objection to the release of funds. UP's ability to avoid summary judgment rests upon whether there is a material issue of fact as to if its nonperformance is excused by the force majeure clause in the Purchase Agreement.[1]

Ultra's first argument as to why summary judgment is warranted rests upon contract interpretation. Ultra concedes that "[t]he Agreement does not expressly address release of the roof escrow in the instant situation - where UP has failed to replace the roof by December 31, 2007, and subsequently objected to the release of the escrow." (Pl.'s Br. In Supp. Of Mot. For Par. Summ. J., p. 8.) So, Ultra contends Section 14.1 of the Purchase Agreement can be interpreted two ways: (1) Royal should be required to release the roof escrow to Ultra due to UP's failure to complete the roof

---

[1] The Court notes that UP did not set forth force majeure or impossibility as an affirmative defense in its answer. However, UP denied the following assertion in Ultra's complaint: "UP did not complete the Roof Repairs and invoice SVT for its share of the costs by December 31, 2007, nor was there any event of force majeure or any other events, matters or delays beyond UP's control that would have prohibited UP from completing the Roof Repairs by December 31, 2007." (Compl. ¶ 15.) Ultra has not argued that failure to specifically enumerate force majeure as an affirmative defense precludes UP from raising the defense in this motion.

replacement by December 31, 2007, despite UP's objection; or (2) Royal can continue to maintain the roof escrow for some indefinite period of time (presumably until the roof is replaced) in light of UP's objection. Ultra argues that only the first interpretation is consistent with the parties' intent as expressed in the contract. It is true that Indiana courts have ascertained the intention of the parties by "reading the contract as a whole" and attempting to "construe the language so as to not render any words, phrases, or terms ineffective or meaningless." *Hilbert v. Conseco Services, LLC,* 836 N.E.2d 1001, 1008 (Ind. Ct. App. 2005).[2] But the Court disagrees that this truism makes it clear that the parties must have intended for Royal to disburse the roof escrow to Ultra after either the completion of the roof replacement or December 31, 2007, *whichever occurred first*. (Pl.'s Br. In Supp. Of Mot. For Par. Summ. J., p. 9.) Such an interpretation would render the force majeure provision a nullity. Ultra itself seems to back off this argument later in its memorandum, admitting that:

> While it appears that the contract did contemplate UP objecting to the disbursement of the roof escrow for failure to complete the roof replacement by December 31, 2007, the contract sets out the only grounds appropriate for such an objection - "force majeure or other events, matters or delays beyond the reasonable control of Purchaser." These specific grounds for objection are consistent with the Parties' intent that Ultra would help insure the completion of the roof for a specific time

---

[2]The parties agree that Indiana law applies to the contract at issue.

>  period and would only insure past that period for some reason that was beyond UP's control.

(Pl.'s Br. In Supp. Of Mot. For Par. Summ. J., p. 10.) Of course, Ultra has made this exact argument under the contract - that UP should be excused from performance because of events beyond its reasonable control.

Ultra contends that UP's generic objections articulated in its January 9, 2008 letter (namely, UP "does not believe that the Agreement requires or even permits a disbursement of the Roof Escrow at this time") (*see* Rosen Aff. Ex. C), are not sufficient to allow Royal to indefinitely possess the roof escrow. However, the Purchase Agreement is silent as to whether Ultra needed to give written notice of a force majeure event, and nothing provides that Ultra was required to give specific notice of a force majeure. Rather, the Purchase Agreement simply provides that Ultra should replace the roof by December 31, 2007 "subject to extensions for force majeure or other events, matters or delays beyond the reasonable control of Purchaser" and that "[i]f Purchaser does not object to such release [of the escrow funds] within five (5) business days after receipt of such notice from Escrow Agent, then the Roof Escrow shall be disbursed by the Escrow Agent to Seller . . . ." (Compl. Ex. A, Section 14.1.) It is undisputed that Ultra filed a timely objection to the demand for release of escrow funds. Because the Purchase Agreement does not set forth any additional specifics about the manner in which UP should have objected, the

12

Court does not believe UP can be faulted for not specifically mentioning the alleged force majeure events in its objection.

Ultra's second argument as to why summary judgment is appropriate is because Section 14.1 of the Purchase Agreement does not excuse performance for the problems UP allegedly encountered. Ultra cites *Miami Sand & Gravel, LLC v. Nance*, 849 N.E.2d 671, 681 (Ind. Ct. App. 2006), for the proposition that whether certain events constitute force majeure is a matter of law for the Court to decide. However, that case does not hold it is *always* a matter of law whether an event constitutes force majeure. In *Miami Sand*, the Court simply found that under the circumstances, with the lack of specificity and detail in the accompanying affidavit, it was "insufficient to create a genuine issue of material fact," thus the trial court properly concluded as a matter of law that an event did not constitute force majeure. *Id.*

It is possible that the issue is one of fact for the fact-finder to determine. For example, in *Raw Materials Inc. v. Manfred Forberich GMBH & Co.*, No. 03 C 1154, 2004 WL 1535839 (N.D. Ill. July 7, 2004), the plaintiff alleged breach of contract when the defendant failed to meet its contractual obligation to deliver used railroad rail to plaintiff. Plaintiff moved for summary judgment on the breach of contract claim, and the defendant defended on force majeure grounds, arguing unexpected weather conditions for the St. Petersburg port prevented the defendant's performance. The

Court denied summary judgment, finding:

> Whether it was foreseeable that such severe weather would occur and would stop even the icebreakers from working is a question of fact for the jury. In so holding, the Court notes that the freezing over of the upper Mississippi River has been the basis of a successful force majeure defense. *See Louis Dreyfus Corp. v. Continental Grain Co.*, 395 So.2d 442, 450 (La. Ct. App. 1981). In sum, because questions of fact exist as to whether the early freezing of the port prevented [defendant's] performance and was foreseeable, [defendant's] *force majeure* affirmative defense may be viable and summary judgment would be inappropriate.

*Id.* at *6.

In this case, UP has set forth sufficient evidence to establish a material issue of fact as to whether it is excused from timely performance because of "force majeure or other events, matters or delays beyond the reasonable control of Purchaser." (Compl. Ex. A, Section 14.1.) UP has established that during the negotiation of the Purchase Agreement, the issue of using union labor was never raised or discussed by the parties. During the initial acceptance of bids, UP did not know that union labor was desirable or necessary. When UP made this discovery, it diligently investigated and sought another bid employing union labor, and it promptly began the project after the November 21, 2007 change order was signed. Although there is not a lot of evidence in the record about the weather that winter, and whether it was truly unusual for northwest Indiana, UP did produce two affidavits attesting that the weather was extraordinarily bad, and that bad weather prevented the

14

roof repairs from being completed by December 31, 2007. (Soboleski Aff. ¶ 17; Turnell Aff. ¶ 7.) Taken in totality, this evidence is sufficient to raise a material issue of fact as to whether UP's delayed performance is excused from SVT's demands for union labor and/or the extreme weather.

Ultra argues that because the bidding process was in UP's control (admittedly, UP did select the sub-contractor), the event cannot qualify as force majeure. While it is true that a force majeure is often defined in contracts as catastrophic events such as acts of God, acts of the public enemy, insurrections, riots, labor disputes, labor or material shortages, fires, explosions, floods, breakdowns of plants or equipment, interruptions to transportation, or river freeze-ups (see the force majeure clause in the contract in *Indiana-Kentucky Electronic Corp.*, 476 N.E.2d 141, 145 n. 2 (Ind. Ct. App. 1985)), the Purchase Agreement in this case specifically exempts "force majeure or other events, matters or delays beyond the reasonable control of Purchaser." (Compl. Ex. A, Section 14.1.) Ultra contends that only the events specifically included in the clause should be excused - but that is the problem with this clause. It does not specifically mention *any* events, thus it is difficult to determine whether the nature or kind of the events that occurred in this case were contemplated as excusing performance. Rather, the parties agreed to, and contracted to the language that "events, matters or delays beyond the reasonable

15

control of Purchaser" will be excused. This Court cannot say, as a matter of law, that SVT's insistence on using union labor, and UP's fear of violating SVT's contract was within the reasonable control of UP and was foreseeable. This is a factual questions for the jury to determine. Additionally, whether the presence of freezing moisture on the roof in December and November in Northwest Indiana was foreseeable is a question for the jury. Therefore, summary judgment is inappropriate.

Because summary judgment is not warranted, the Court also denies Ultra's request for costs and attorney fees under the terms of the Agreement. Finally, because the roof has now been completed, the Court grants UP's request that the Clerk of Court release the roof escrow funds to Ultra. Note, however, that the release of the funds does not imply that UP has satisfied its entire obligation to Ultra under the contract, and this ruling bears no reflection upon whether Ultra's claims will ultimately succeed in this action.

CONCLUSION

For the reasons enumerated above, the motion for partial summary judgment is **DENIED**. The motion to release roof escrow funds is **GRANTED** and the Clerk of Court is **DIRECTED** to release the disputed Roof Escrow Funds in the amount of $208,179.00, along with all interest accrued thereon, to Plaintiff, IPF/Ultra Limited

Partnership.

**DATED: August 19, 2008**          **/s/ RUDY LOZANO, Judge**
                                                           **United States District Court**